Filed 12/18/13  P. v. Solis CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>OSCAR SOLIS,<br><br>    Defendant and Appellant. | 2d Crim. No. B235384<br>(Super. Ct. No. BA341563)<br>(Los Angeles County) |

Oscar Solis appeals from the judgment following his conviction by jury of first degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] and attempted murder (§§ 664/187, subd. (a)).  The jury found multiple personal firearm use allegations to be true.  (§ 12022.53, subds. (b), (c) & (d).)  Appellant moved for a new trial.  The trial court denied his motion and sentenced him to prison for 84 years to life.  Appellant contends he was denied the effective assistance of counsel.  He also contends, and respondent agrees, the abstract does not accurately reflect the judgment.  We affirm but direct the trial court to correct errors in abstract of judgment form CR292 and to prepare an abstract of judgment form CR290.

---

[1] All statutory references are to the Penal Code unless otherwise stated.  There were two trials in this matter; the first ended in a mistrial when the jury could not reach a verdict.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Evidence*

Omar Sorroza-Garcia (Sorroza) knew David Juarez for several years. They were business partners who manufactured (cooked) and sold methamphetamine. Juarez obtained pseudoephedrine, an essential methamphetamine ingredient, from different suppliers, including Daniel Rodriguez, who lived with appellant. Juarez paid pseudoephedrine suppliers from proceeds of sales of the resultant methamphetamine. After Rodriguez died, Juarez found another supplier.

Juarez also cooked methamphetamine for appellant to sell. Sorroza knew appellant, but had no business relationship with him. On one occasion, Juarez burned a batch of methamphetamine he cooked using pseudoephedrine supplied by appellant. The product was not fit to sell. Appellant accused Juarez of selling the product and falsely claiming it was burned, and they engaged in an ongoing dispute. Appellant called to complain with such frequency that Juarez eventually stopped answering his calls. Otylynda Delgado, his common-law wife, would answer and tell appellant Juarez was not home.

Juarez's neighbor, Horacio Smiley, sometimes worked as his armed bodyguard. Smiley went to Juarez's residence in early 2003, when appellant was due there. Appellant arrived with two men, including his constant companion, Calvin Belloso (Oso). Appellant demanded that Juarez pay him, or give him Juarez's truck. Smiley separated appellant and Juarez to prevent a physical altercation. Smiley also displayed a gun, and told appellant to leave. Appellant complied. Juarez later told Delgado appellant had threatened his life. Juarez bought a gun and never left the house without it. On a subsequent occasion, Juarez was meeting appellant at a restaurant. Smiley accompanied Juarez, and observed a pistol and an AK-47 rifle in appellant's parked car.

On March 16, 2003, Juarez drove his car, with Sorroza in the front passenger seat. They picked up Smiley and took him to his apartment at the corner of Jefferson and West Boulevards. Juarez waited in his car with Sorroza while Smiley was inside.

2

A gray primer-colored Camaro IROC approached and stopped on West Boulevard, next to Juarez's car. Both cars faced north, with the Camaro's passenger side next to the driver's side of Juarez's car. Sorroza and Juarez stayed in his car. Something that felt like a metal bat or baton hit Sorroza's back. It was a bullet. Sorroza leaned forward, looked toward the Camaro, saw a flash, and heard shots firing toward Juarez's car. Sorroza saw and recognized the shooter, appellant, in the front passenger seat. Appellant yelled, "mother fucker," and the Camaro sped away. Juarez slumped in the driver's seat, with blood flowing from the left side of his head. Despite his wounded back, Sorroza ran to Juarez's home, a few doors away. He told Delgado and Juarez's father, Jose Juarez, that he and Juarez were shot. Jose and Delgado ran to Juarez.

Upon hearing multiple gunshots, Smiley looked outside and saw the gray Camaro before it sped away. Smiley ran outside, removed his shirt, applied it to Juarez's head, and yelled for help. Juarez's sister, Bertha Juarez, ran to Juarez and applied pressure to his wound. Juarez was not responsive.

At trial, Sorroza identified appellant as the shooter. Appellant vigorously attacked Sorroza's in-court identification. He stressed that Sorroza did not name appellant as the shooter until 2007, although detectives had questioned Sorroza in March 2003, and February 2004. Before 2007, Sorroza informed detectives of the ongoing dispute between Juarez and appellant, and Sorroza identified a photograph of appellant. In 2007, when detectives telephoned him in Mexico, Sorroza said he knew who shot Juarez. In subsequent discussions, Sorroza provided more details and ultimately identified appellant as the person who shot him and Juarez. In addition, Sorroza identified a photograph of Oso as someone who resembled the person who drove the Camaro during the shooting. Sorroza further informed detectives that he and Juarez once rode in that Camaro.

Delgado testified that Oso and appellant were almost always together. She further testified she saw Sorroza at the hospital after the shooting. He told her that one of the shooters reminded him of Oso.

3

Ismael Caneal testified that in 2003, he owned a gray 1987 Camaro Z28 IROC. Caneal's brother kept a set of keys to that Camaro in his house. Caneal's niece and her boyfriend or husband, Oso, visited Caneal's brother at that house.

Juarez remained in the hospital for about a month after the shooting and never regained consciousness. He died from two fatal gunshot wounds.

*Defense Evidence*

Starr Sachs, a retired Los Angeles Police Department firearms analyst, reviewed the bullets and bullet fragments recovered at the shooting scene. She concluded that guns of at least two different calibers were used in the shooting.

Appellant called Torrance Police Department Detective Charlie Fisher to impeach Sorroza. His testimony follows in the discussion below.

*New Trial Motion*

Appellant filed a motion for new trial, claiming he was deprived of the effective assistance of counsel. The trial court denied that motion.

DISCUSSION

*Ineffective Assistance of Counsel*

To show ineffective assistance of counsel, the defendant must establish (1) that counsel's representation fell below an objective standard of reasonableness, and (2) a reasonable probability that, but for counsel's errors, the defendant would have achieved a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694; *People v. Holt* (1997) 15 Cal.4th 619, 703.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*People v. Williams* (1997) 16 Cal.4th 153, 214–215.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*In re Fields* (1990) 51 Cal.3d 1063, 1079.) Appellant has failed to establish sufficient prejudice to support his ineffectiveness claims.

4

A. *Impeachment of Sorroza*

Appellant argues that trial counsel was ineffective because he did not present wiretap evidence which implicated Sorroza in a drug conspiracy. We disagree.

At the time of trial, Sorroza was in custody, facing drug conspiracy charges in San Diego, and his attorney advised him not to testify at appellant's trial. The drug conspiracy charges are not related to this case. Sorroza admitted his ongoing involvement in manufacturing and selling methamphetamine, but claimed he was unaware of the facts underlying the drug conspiracy charges. He expressly denied he was involved in a conspiracy to distribute methamphetamine.

Trial counsel impeached Sorroza with testimony from Detective Fisher, a member of the task force that investigated and arrested Sorroza, and other participants in the charged drug conspiracy. On April 8, 2010, Fisher saw Sorroza drive Mario Vasquez to a restaurant where Vasquez got into a Nissan Maxima. Vasquez drove the Nissan away, and Sorroza followed him briefly. On the same evening, the police arrested Vasquez, impounded the Nissan, and recovered 23 pounds of methamphetamine. The Nissan also contained handwritten notes, with Sorroza's alias ("Borrego") and a telephone number.

Appellant recognizes that Sorroza "undermined his reliability as a witness" by repeatedly telling "police that he could not identify the shooter" for years after Juarez died, and identified him only when Sorroza "wanted assistance in legally moving back to the United States." Appellant also acknowledges that "Sorroza's credibility was seriously challenged at trial" and Sorroza "was a convicted robber and drug trafficker" who "admitted manufacturing methamphetamine for several years." Nonetheless, appellant claims the wiretap evidence was critical because it documented Sorroza's involvement in illegal activities near the time of trial, "when his credibility was being judged."

The wiretap evidence was not critical. It is not reasonably probable that the outcome of appellant's trial would have been more favorable if counsel had introduced Sorroza's wiretapped statements. The wiretap evidence was largely cumulative to Fisher's testimony describing appellant's participation in the drug conspiracy. In denying

5

the new trial motion, the trial court cited several reasons the jury would reject Sorroza's testimony regarding the recent drug conspiracy: "As far as cross-examination, including the recordings from the DEA, I can't imagine based on what I heard and the way [Sorroza] was cross-examined about the . . . incident in San Diego County, that anybody had even the slightest doubt he was lying. He was completely lying . . . . The officer's testimony was completely credible. [Sorroza's] denials were ridiculous. And I don't think it would have made any difference if [defense counsel] had played the tapes and I don't think there's any reasonable possibility any of the jurors thought for a second that [Sorroza] was truthful when he denied his involvement in the new drug case." Appellant has failed to meet his burden of establishing a reasonable probability that, but for counsel's failure to impeach Sorroza with his wiretapped statements, he would have achieved a more favorable result.

### B. Failure to Challenge Testimony Regarding the Killing of Rodriguez

Appellant contends that the prosecutor's references to the Rodriguez murder suggested he was involved in Rodriguez's death. As appellant acknowledges, "the evidence at [the second] trial did not directly link [him] to the Rodriguez murder." It is not reasonably probable that appellant's trial would have resulted in a more favorable outcome if counsel had challenged the evidence of the Rodriguez killing.

### Abstract of Judgment

The jury convicted appellant of murder and found true the allegation that the murder was willful, deliberate, and premeditated. It also convicted him of attempted murder but found the allegation that the attempted murder was willful, deliberate, and premeditated to be "not true." The trial court sentenced appellant to prison for 84 years to life, including a 25 years to life indeterminate term for murder, with a 25 years to life firearm enhancement, and a consecutive 9-year determinate term for attempted murder.

The form CR-292 abstract of judgment, however, does not accurately reflect this result. First, box 1 indicates appellant was convicted of "willful, deliberate, premeditated" attempted murder in count 2. He was not. Box 1 should indicate appellant was convicted only of attempted murder in count 2 (§ 664, subd. (a)). Second, box 6(c)

6

states appellant was sentenced to prison for an indeterminate term of nine years to life. He was not. He was sentenced to a nine-year determinate term. Box 6(c) should be blank. Third, box 7 is blank. Box 7 should indicate appellant received a determinate term. Consequently, the superior court file requires a separate, additional form (CR290) for the determinate nine-year term imposed for count 2. We direct the superior court clerk to prepare abstract of judgment forms CR290 and CR292 which accurately record the sentence imposed by the trial court.

DISPOSITION

The trial court is directed to prepare abstract of judgment forms CR290 and CR292 which correctly reflect both the determinate and indeterminate terms of appellant's sentence, as described in this opinion. Thereafter, the clerk shall forward these forms to the Department of Corrections and Rehabilitation. Otherwise, the judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

7

William Sterling, Judge

Superior Court County of Los Angeles

_____


John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, Douglas L. Wilson, Deputy Attorney General, for Plaintiff and Respondent.